Jennifer CIZEK and Joseph
Cizek, Appellants,

v.

CONCERNED CITIZENS OF EAGLE
RIVER VALLEY, INC., Nora Firmin,
Patricia Balzarini, and Charles Balzari-
ni, Appellees.

No. S–9574.

Supreme Court of Alaska.

Feb. 1, 2002.

William S. Cummings, Ashburn & Mason, P.C., Anchorage, for Appellants.

Suzanne H. Ewy, Law Offices of Suzanne H. Ewy, Eagle River, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

The Cizeks appeal a superior court decision that enjoined their use of a parcel of land as an airstrip after the court held that the airstrip was not a continuing nonconforming use under Anchorage zoning laws. Because a nonconforming use of property is not maintained simply by the property's continual suitability for the use or by sporadic unauthorized use, we affirm the trial court's decision.

## II. FACTS AND PROCEEDINGS

This case centers on the history of a private airstrip in Eagle River. Harvey Pullen homesteaded a parcel of land in 1964 on which he built the airstrip—then in an unrestricted zoning area. In 1970 Pullen sold a part of his homestead adjacent to the airstrip to the Leonards. James "Pat" Leonard is a pilot and used the airstrip with Pullen's permission. In 1974 Pullen sold the balance of the homestead, including the airstrip, to Robert and Katie Spils and Helen Cole. As part of the sale, the Spilses and Cole signed a written agreement with Pullen granting Leonard a revocable license to continue using the airstrip. The agreement was not recorded.

In 1982 the Spilses and Cole sold their parcel to a group of investors called the Eagle River Partnership (Partnership), which intended to develop the property, including the airstrip, as a subdivision. Two years later, in 1984, the property was rezoned R–10, for which an airstrip is not a permitted or conditional use. The following year, the Partnership discovered the existence of the written agreement with Leonard and sued to quiet title. Leonard settled with the Partnership and agreed not to use the airstrip as a condition of settlement.

After Leonard's settlement, two other pilots, Leonard's friends Lee McElhany and Ken Evans, continued to use the airstrip on a

very infrequent basis, but not with the knowledge or consent of the Partnership.

By 1990 the Partnership's development plans had fallen through and the land went through several conveyances, including reconveyance to the Spilses and Cole in lieu of foreclosure. Steve Dike and Barry Kell purchased the property in 1990. Dike built a house on the property in 1991–92, and Kell conveyed his interest to Dike in 1994.

Dike hit upon the idea of selling parcels of the property as a fly-in subdivision. In 1995 he cleared the airstrip and petitioned the Municipality of Anchorage to rezone the parcel R–6 for the fly-in subdivision and to grant a conditional use allowing the airstrip to be used. The public hearing process regarding the rezoning engendered a great deal of neighborhood opposition. The Department of Planning assigned Municipal Code Enforcement Manager David Brennan to determine if the airstrip was a legal nonconforming use; he concluded it was. Acting on Brennan's advice, the Planning Commission granted the conditional use and recommended that the Anchorage Assembly rezone the property.

Eagle River resident Art Isham appealed the Planning Commission's conditional use decision. In April 1996 the Assembly decided to stay the commission's approval of the conditional use for the airstrip, concluding that the conditional use should not take effect until a zoning change was approved. The next month the Assembly provisionally granted Dike's rezoning request, requiring that he first file a plat in conformity with his plans. Dike never filed the plat, and no further action was taken: the property was not rezoned.

About a year later, in 1997, Dike sold half the property to the Cizeks. They planned to build a home with an attached hangar and use the airstrip. But in 1998, an organization calling itself Concerned Citizens sued to enjoin Dike and the Cizeks from using the airstrip; Concerned Citizens claimed that the nonconforming use right had lapsed from non-use between 1985 and 1995.

After a bench trial, Superior Court Judge Brian C. Shortell ruled in favor of Concerned Citizens that the nonconforming use rights had lapsed.

The Cizeks appeal.

## III. DISCUSSION

### A. The Airstrip Was Not a Continuing Nonconforming Use.[1]

The Cizeks challenge the trial court's interpretation and application of Anchorage Municipal ordinances governing nonconforming uses. They claim that the airstrip on their property was a continuing nonconforming use under Anchorage's zoning laws.

Although the Anchorage Municipal Code tolerates nonconforming uses, it encourages their termination and prevents them from expanding.[2] Anchorage Municipal Code (AMC) 21.55.030 governs nonconforming uses of land. It states in relevant part:

> Where, at the time of the original passage of applicable regulations, lawful use of land existed which would not be permitted by the regulations thereafter imposed ..., and where such use involves no individual structure other than small or minor accessory buildings, the use may be continued

1. We use our independent judgment "[w]here the interpretation of a zoning ordinance presents only a question of statutory construction which does not involve agency expertise or the formulation of fundamental policies," *Balough v. Fairbanks North Star Borough*, 995 P.2d 245, 254 (Alaska 2000), and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

2. Anchorage Municipal Code 21.55.010 describes the intent of the code regarding nonconforming uses:

> Within the zoning districts established by this title ... there may exist ... uses of land ... which were lawful before the effective date of the applicable regulations, but which would be prohibited, regulated, or restricted under the terms of chapters 21.35 through 21.50.... It is the intent of this chapter to permit these nonconformities to continue until they are removed, but not to encourage their perpetuation. It is further the intent of this chapter that nonconformities shall not be enlarged upon, expanded or extended, or be used as grounds for adding other structures or uses prohibited elsewhere in the same district.

so long as it remains otherwise lawful, provided:

. . . .

C. If any such nonconforming use of land ceases for any reason for a period of more than one year, any subsequent use of land shall conform to the regulations specified by this title for the district in which such land is located.

### 1. Actual use is required to continue nonconforming uses.

■ The Cizeks argue that the fact that the airstrip was usable as an airstrip throughout the relevant time period should suffice to continue an existing nonconforming use. They reason that the "use" contemplated by the Municipal Code is the "use of the land as an airstrip, not use of the airstrip by planes."

But the Cizeks' interpretation of what satisfies the Municipal Code to continue a nonconforming use is illogical. If we were to adopt the Cizeks' interpretation, local governments could almost never terminate a nonconformity because it would legally continue as long as the land's physical suitability for actual nonconforming use remained. In effect, then, the Cizeks propose to define cessation of use under AMC 21.55.030(C) as cessation of all potential for use. We doubt that the Anchorage Assembly had this result in mind when it provided for the termination of nonconformities after more than one year of the cessation of the prior use of the land.

We rejected an analogous argument in *Kelly Supply Co. v. City of Anchorage*.[3] There, a legal nonconforming use was established by the Alaska Crippled Children's Association for a "diagnostic, treatment and educational center for handicapped children" within a district zoned for residential use.[4] After the children's center vacated the building, the zoning board approved the new owner's petition to use the building as a blood bank under the existing nonconforming use.

Later, the owner leased parts of the building to the Alaska Mental Health Association and the Rural Alaska Community Action Program. The trial court upheld the zoning board's challenge to those uses as not being consistent with the existing nonconforming use. On appeal, the building owner argued that it had a vested right to use the building in the same manner as the previous owner and that the current use was consistent with the prior use because both were "medical uses."[5] We disagreed, holding that the decision of the zoning board to approve the blood bank's use under the previous nonconforming use terminated any other rights held under the prior use. We also specifically rejected Kelly Supply's argument that no change in use occurred, noting that the transition from the use as a disabled children's center to a blood bank "was a change of use."[6] Therefore, we rejected the argument that the nonconforming use had not changed simply because the physical infrastructure for both medical uses was similar.

Moreover, we have noted a policy that "nonconforming uses are to be restricted and terminated as quickly as possible"[7] because those uses frustrate a local government's implementation of consistent and logical land use planning. The Anchorage Municipal Code echoes this policy stating an intent to "permit . . . nonconformities to continue until they are removed, but not to encourage their perpetuation."[8] We will not frustrate that intent by defining use to include usability.

We therefore reject the Cizeks' argument that because the land was usable as an airstrip the nonconforming use continued.

### 2. Sporadic, unauthorized use will not continue a nonconforming use.

■ The Cizeks next argue that the occasional use of the airstrip by McElhany and Evans continued the nonconforming use. They assert that McElhany and Evans used

3. 516 P.2d 1206 (Alaska 1973).

4. *Id.* at 1207–08.

5. *Id.* at 1209–10.

6. *Id.*

7. *Id.*

8. AMC 21.55.010.

the airstrip at least once per year between 1985 and 1995 and that use continued the nonconformity. Concerned Citizens argues that McElhany's and Evans's use of the airstrip was trespass and should not be counted as use to sustain a nonconforming use. Alternatively, Concerned Citizens argues that even if McElhany's and Evans's flights were not trespass, they were too infrequent to continue the nonconforming use.

The trial court ruled that the nonconforming use terminated after the Leonards disclaimed any interest in the land in 1985. The court found that no one other than McElhany, Evans, and Leonard used the airstrip between 1984 and 1990; the use was not known to the owners; the airstrip was not maintained for a period of at least five years; and airplanes were not stored at the airstrip.[9]

After reviewing the record, we believe that the trial court was not clearly erroneous in finding that McElhany and Evans were the only pilots that may have used the airstrip at least yearly between 1984 and 1995—the Cizeks concede this. And it is also a reasonable inference from the evidence in the record that their use was at best unauthorized and may have been trespass. Pat Leonard testified that he knew that the 1985 settlement precluded him from using the airstrip, but that he invited McElhany and Evans to use the airstrip for their annual flight checks and for social visits. McElhany and Evans apparently assumed Leonard owned the airstrip; they therefore never sought or received the owners' permission to use the airstrip.

Given this evidence, we conclude that the trial court did not err in finding that the highly intermittent, unauthorized use by McElhany and Evans did not suffice to continue the nonconforming use.[10]

## B. The Statute of Limitations Had Not Run.[11]

■■■ The Cizeks argue that the statute of limitations had run on Concerned Citizens' cause of action. They assert that the action was subject to the two-year limitations period for actions upon a statute and that the period began to run in March 1995, when Dike began actively using the property as an airstrip. Concerned Citizens argues that the trial court correctly ruled that the cause of action accrued each day that the property violated the zoning laws. We agree.

---

9. The relevant findings of the trial court stated:

> 17. From 1986 through 1990, the Eagle River Partnership owned the property. During that time neither the Eagle River Partnership, its individual members, or any of its representatives maintained, flew on and off, stored airplanes on, or used the strip for aircraft operations. No maintenance of the strip took place from 1982–1990, and no usable planes were stored on the property during that time....
> 20. No one except Leonard, Evans, or McElhany used or flew on and off the strip from 1984 through 1990.
> 21. From 1985 to 1991, no pilot who used the strip had the owners' permission to use it. Leonard was, during those years, contractually and legally bound not to use it. For a period of at least five years, from December 1985 through 1991, no one with an ownership interest in the property maintained the strip, or kept airplanes there, or gave permission for its use, or acquiesced in its use.

> The court then ruled that:
> 40. The Leonards' legal right to use the property as an airstrip terminated with their settlement of the Eagle River Partnership lawsuit against them in December, 1985.
> 41. Pat Leonard's use from December, 1985 through the date he was given permission by

Dike to use the property, was in violation of his written settlement agreement with Eagle River Partnership and the Leonards' disclaimer of interest. This renders any use during that time by Leonard insufficient to maintain a nonconforming use. He had no legal right to allow Evans or McElhany to use it as they did. Their use, as well as his, was non-consensual and unknown to the owners of the property.
> 42. Pursuant to A.M.C. 21.55.030, the valid nonconforming use that existed in 1985 terminated, as the nonconforming use of the property ceased for a period of more than one year. Evans' and McElhany's use that was unknown to the owners and unconsented to by them will not operate to preserve a nonconforming use that effectively ended in December, 1985.

10. We note that federal regulations of private airstrips define private use to exclude use unauthorized by the airstrip owner. *See* 14 C.F.R. § 157.2 ("Private use means available for use by the owner only or by the owner and *other persons authorized by the owner*.") (emphasis added).

11. We "exercise our independent judgment when interpreting and applying statutes of limitations." *McDowell v. State*, 957 P.2d 965, 968 n. 4 (Alaska 1998).

Where a cause of action is based on a continuing violation of a land use regulation, the Anchorage Municipal Code provides that each day is a separate violation: "Each act or condition in violation of this title, and every day upon which the act or condition occurs, is a separate violation of this title."[12] Therefore, the statute of limitations started to run anew each day that the property was in violation, and Concerned Citizens' suit was timely.

### C. Estoppel and Laches Did Not Bar the Action.[13]

The Cizeks argue that Concerned Citizens should be estopped from arguing that the nonconforming use was discontinued before 1995; alternatively, they argue that laches bars Concerned Citizens' suit.

The trial court, in a separate decision and order, rejected the Cizeks' estoppel and laches defenses. With respect to the estoppel argument, the court ruled that the Cizeks did not reasonably rely on any Municipal assertion of an existing nonconforming use and would not be prejudiced by enforcing the zoning restrictions. More important, the court noted that "[e]ven if the Municipality's assertion should estop it from forbidding the Cizeks['] use of the airstrip, justice would not require [Concerned Citizens] ... to be similarly estopped." With respect to laches, the court held that the defense did not apply because Concerned Citizens did not unduly delay in bringing suit.

We agree with the trial court that there was no basis for applying estoppel to Concerned Citizens' arguments.[14] The Cizeks cannot assert estoppel against Concerned Citizens because Municipal ordinances give citizens an independent right of action to enforce zoning laws;[15] Concerned Citizens did not make an assertion upon which the Cizeks relied, and statements by the Municipality could not have estopped the group.[16]

Laches is a somewhat closer call.[17] The Cizeks assert that laches should have barred Concerned Citizens' suit because it waited more than three years to sue after Code Enforcement Manager Brennan's decision declared the airstrip a nonconforming use.

We recently discussed the application of laches in *Laverty v. Alaska Railroad Corp.*[18] There Laverty sued to enjoin a contract between the railroad and a contractor—Flamingo Brothers—fifteen months after learning of the contract and his potential cause of action. In the interim, Laverty "knew, over the course of his one-year delay in bringing suit, that Flamingo Brothers was spending large amounts of time and money on geotechnical studies to support its land use permit applications."[19] We held that the trial court did not abuse its discretion in applying laches.

By contrast, the Cizeks do not argue that Concerned Citizens' lawsuit was unduly delayed based on the time-line of the Cizeks' ownership of the property. In fact, they do not even challenge the trial court's finding

---

**12.** AMC 21.25.010(B).

**13.** Whether the legal doctrines of estoppel and laches apply to a case are questions of law to which we apply the substitution of judgment standard of review. *State, Dep't of Commerce & Econ. Dev. v. Schnell*, 8 P.3d 351, 355 (Alaska 2000) (estoppel); *id.* at 358 (laches). Under that standard we will interfere with a trial court's broad discretion to deny the application of estoppel or laches only when we have "a firm and definite conviction that a mistake has been made." *Keener v. State*, 889 P.2d 1063, 1066 (Alaska 1995).

**14.** The defense of estoppel has four elements: (1) A party substantially changes position; (2) in reliance on a promise made by another; (3) the reliance was either actually foreseen or reasonably foreseeable by the promisor; and (4) en-

forcement of the promise is necessary in the interests of justice. *See Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1142 (Alaska 1996).

**15.** *See* AMC 21.25.050.

**16.** *See* 28 Am.Jur.2d, *Estoppel & Waiver* §§ 32, 131 (2000).

**17.** Laches has two elements: the defendant must show (1) that the plaintiff has unreasonably delayed in filing suit and (2) that the delay caused the defendant undue harm or prejudice. *See City & Borough of Juneau v. Breck*, 706 P.2d 313, 315 (Alaska 1985).

**18.** 13 P.3d 725, 729 (Alaska 2000).

**19.** *Id.*

that Concerned Citizens filed its suit shortly after learning that the Cizeks purchased the property. Instead, quoting *Kohl v. Legoullon*,[20] the Cizeks assert that an aggrieved party must "file suit promptly once it is clear the transgressor has committed to an irrevocable course of conduct."

But here, the only transgressors seeking the protection of the laches defense were the Cizeks; and they bought the property in the fall of 1997. Before the Cizeks bought the property, no other party had actively sought to re-establish use of the airstrip since 1995, when the Assembly stayed the Planning Commission's decision to grant Dikes a conditional use. Because the Cizeks apparently concede that Concerned Citizens did not learn of their ownership or their plans regarding the airstrip until the spring of 1998, we hold that the trial court did not abuse its discretion in finding no undue delay in Concerned Citizens' June 1998 suit.

### D. The Cizeks Waived Their Claim for Rule 37 Sanctions.[21]

The Cizeks assert that the superior court abused its discretion in failing to assess sanctions against Concerned Citizens after the court granted two of the Cizeks' three motions to compel discovery.[22] Concerned Citizens points out in response that Civil Rule 37 requires a hearing before awarding

attorney's fees against a party, that the Cizeks never requested a hearing, and that a hearing was never held.

We have held that a party waives a claim if the trial court neglects to resolve a pending matter and the party fails to draw the court's attention to it before judgment.[23] Here, the Cizeks had moved to compel discovery and asked for sanctions; the trial court granted their motions to compel but did not address their request for sanctions. If the Cizeks wanted the issue resolved, they should have called the trial court's attention to the undecided sanctions motion prior to judgment. While the Cizeks did point out that they had filed previous motions to compel in their subsequent motions, and while they requested new sanctions, they did not renew their prior requests or seek a hearing on their new requests. Given these circumstances, the Cizeks had a duty to request a ruling on these unresolved matters before final judgment.[24] Because they did not, we consider them waived.

### E. The Trial Court Did Not Abuse Its Discretion by Denying Motion for a New Trial.[25]

The Cizeks argue that the trial court· should have granted their motion for a new trial because it decided the case based upon

---

20. 936 P.2d 514, 517 (Alaska 1997).

21. We review a trial court's decisions regarding discovery sanctions under Civil Rule 37 for an abuse of discretion. *Glover v. Sager*, 667 P.2d 1198, 1203–04 (Alaska 1983).

22. The Cizeks base their argument on Alaska Civil Rule 37(a)(4), which provides:
    If the motion [to compel] is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response or objection was substantially justified, or that other circumstances make an award of expenses unjust.

23. *See Virgin v. Virgin*, 990 P.2d 1040, 1050 (Alaska 1999) (holding that failure to raise discretionary issue regarding child support before trial court waived issue on appeal); *von Stauffenberg v. Comm. for Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1061 (Alaska 1995) (failure to raise capacity as defense before trial court waived issue).

24. *See Kollodge v. State*, 757 P.2d 1024, 1028 (Alaska 1988) (holding that party should have made motion to impose Civil Rule 11 sanctions so that trial court had a chance to rule on the motion).

25. The trial court has broad discretion in deciding whether to grant or deny a motion for a new trial. *Buoy v. ERA Helicopters, Inc.*, 771 P.2d 439, 442 (Alaska 1989). We review the trial court's denial of a motion for a new trial under the abuse of discretion standard. *State v. Municipality of Anchorage*, 805 P.2d 971, 973 (Alaska 1991).

an issue raised without notice shortly before trial. They claim that they were prejudiced by the trial court's pretrial finding that McElhany's and Evans's use of the airstrip was unknown and not consented to by the property owners and therefore could not preserve the nonconforming use. The Cizeks also claim that the trial court's decision essentially shifted the burden of proof to them to prove that legal use continued the nonconforming use, rather than placing the burden on Concerned Citizens to show a cessation of use.

Yet it seems clear that at all times the issue before the trial court was whether the airstrip was a continuing nonconforming use. To prevail as plaintiffs, Concerned Citizens bore the burden of showing that there was no legal use of the airstrip for a period of at least one year.[26] Regardless of what legal theories Concerned Citizens advanced to meet its burden, the dispositive legal issue always involved the question of whether there was sufficient legal use of the airstrip to continue the nonconformity—not just whether McElhany and Evans were trespassers.

It became apparent early in the trial that the Cizeks planned to defend against Concerned Citizens' claim of interrupted use by attempting to characterize McElhany's and Evans's use as sufficient to constitute continuing use. Concerned Citizens, in contrast, hoped to establish that this use was too sporadic and that no other use existed. The trial court simply resolved this point by ruling as a matter of law, based on undisputed evidence, that McElhany's and Evans's use could not qualify as a continuous use, no matter how frequent it was, because it was unknown to the owners and had never been authorized. While this ruling certainly deprived the Cizeks of an anticipated defense, they had no vested right to defend a legal theory that proved to be wrong.

■ In the Cizeks' memorandum and affidavits supporting their motion for a new trial, they claimed to have several additional witnesses who could have testified regarding use of the airstrip. The Cizeks' attorney claimed to have chosen not to pursue these witnesses further during discovery because of the associated expenses and his belief that McElhany's and Evans's testimony would be dispositive. It is clear, then, that the Cizeks' decision not to develop or use this evidence was simply a tactical choice.

The Cizeks had notice that the legal use of the airstrip was the central issue in the case. For strategic reasons, they failed to pursue some witnesses and evidence during discovery. It is also evident that the potential witnesses they identified had little, if any, additional evidence to provide had the trial court granted their motion. Their tactical miscalculation affords them no right to another trial. In any event, we note from our review of the Cizeks' motion for a new trial and their other supporting pleadings that the additional testimony they proposed to offer would have added little relevant information concerning the actual use of the airstrip. For these reasons, we hold that the trial court did not abuse its discretion when it denied the Cizeks' motion for a new trial.

## IV. CONCLUSION

The decision of the superior court is AFFIRMED.