Frank S. GRISWOLD, Appellant,

v.

CITY OF HOMER, a municipal
corporation, and Cob, Inc.,
Appellees.

No. S–10321.

Supreme Court of Alaska.

Sept. 20, 2002.

**66**

Frank S. Griswold, pro se, Homer, Appellant.

No appearance by Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Frank Griswold appeals the Homer Planning Commission's approval of nonconforming uses on a lot bordering his own. He alleges that there was insufficient evidence to support the Commission's decision and also makes several claims of procedural error. Because we conclude that there is substantial evidence to support the Commission's decision to approve the nonconforming uses, and Griswold's claims of procedural error have no merit, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Robert L. Stewart, president of COB, Inc., owns the property located at 305 East Pioneer Avenue, which is the subject of this appeal. COB has owned the property since 1982. The property was a service station and garage before COB acquired it, and COB continued this use until 1991, when the gas tanks were removed. The property is located within an area designated by Homer's zoning regulations as the central business district. It is impermissible under zoning regulations for COB to use its central business district property for automobile repair and maintenance unless those uses were "grandfathered in." To take advantage of the grandfather provisions, the owner must have used the property for vehicle maintenance and repair prior to the zoning enactments and must not have discontinued these uses for more than a year.[1] With these requirements in mind, COB performed only occasional automobile repair and maintenance services on the property, with the purpose of maintaining its grandfather rights. During this time, COB substantially remodeled the premises to include a three-bay garage. The remodeling was completed in 1996. Since February 1997 COB has leased the site to a full-service automobile maintenance and repair facility known as Homer Tire and Auto. In 1996 COB petitioned the Homer Advisory Planning Commission to approve its nonconforming uses.

Frank S. Griswold is the owner of nearby, competing Glacierview Garage in Homer. The record also reveals that Griswold and COB are direct competitors in that they have worked on the same cars. Griswold is the only person to object to COB's petition for approval of nonconforming uses.

### B. Procedural History

COB petitioned for acceptance of its nonconforming uses under Homer City Code (HCC) 21.64.035 in October 1996. The Commission found that COB had produced sufficient evidence to show that the property had been used for a public garage, where vehicle maintenance and vehicle repairs had not been discontinued. The Commission also found that COB never "abandoned [its] intent that the Property be used for those purposes." The Commission unanimously approved of COB's continued use of the property as a vehicle maintenance and repair facility and public garage. Griswold appealed to the Homer Board of Adjustment, which reversed the Commission's decision. COB then appealed to the superior court, which in October 1998 reversed the Board with instructions to remand to the Commission to allow COB to present evidence that vehicle

---

**1.** Homer City Code (HCC) 21.64.010; HCC 21.64.015; HCC 21.64.030; HCC 21.64.035.

repair and vehicle maintenance had continued on the property.[2]

On remand, the Commission found that COB had failed to show that the uses actually continued, but determined that COB had intended to continue the nonconforming uses during the years in question. The Commission concluded that the zoning ordinances in effect at the time of COB's application for approval of nonconforming uses required intent to discontinue the use as well as actual discontinuance before the nonconforming use could be lost. The Board adopted the Commission's findings and conclusions. Griswold appealed to the superior court, which again reversed and remanded. This time, the superior court specified that COB's intent was not relevant to the one year non-use provision in HCC 21.64.030. Consequently, the superior court remanded to the Board with instructions to remand to the Commission to determine whether vehicle maintenance or repair ever stopped completely on the property for more than one year. Shortly thereafter, the superior court issued an order clarifying that "the Commission ha[s] consistently used the wrong standard to determine whether COB's various non-conforming uses had been discontinued." The superior court directed the Commission to reconsider evidence of actual use, rather than intent. Accordingly, the superior court instructed the Commission to allow COB to present additional evidence of actual use.

On January 31, 2000, the Commission considered for a third time COB's petition for approval of nonconforming uses. COB president Robert Stewart testified again, and COB provided five affidavits from additional witnesses as well as business records and invoices. The Commission concluded, by a preponderance of the evidence, that COB failed to show that within the past year the property was used for a public garage; thus, COB lost the right to use the property for a public garage.[3] However, the Commission found that COB was entitled to continued use of the property for vehicle maintenance and repair as defined by HCC 21.32.542 and HCC 21.32.543 as lawful nonconforming uses.

Griswold again appealed to the Board, raising the same issues currently before this court, and the Board affirmed the Commission in all respects. Griswold appealed to the superior court,[4] which also affirmed in all respects. Griswold now appeals to this court. The City of Homer and COB have filed notices of nonparticipation.

## III. STANDARD OF REVIEW

Judicial review of zoning board decisions is narrow, and board decisions are accorded a presumption of validity.[5] The zoning body's decision shall not be reversed if it is supported by substantial evidence.[6]

Substantial evidence is generally defined as evidence that "a reasonable mind might accept as adequate to support a conclusion."[7] Zoning board interpretations of

---

**2.** Specifically, the superior court directed the Commission to reopen the record to determine whether "vehicle maintenance," as defined in HCC 21.32.542, and "vehicle repair," as defined in HCC 21.32.543, continued on the property for the years in question. Homer City Code 21.32.542 provides:

"Vehicle maintenance" means to keep a vehicle in proper running condition by services which do not customarily require a qualified mechanic such as the installation and service of lubricants, tires, batteries, and other small accessories.

Homer City Code 21.32.543 provides:

"Vehicle repair or auto repair" means to restore a vehicle to a sound state after decay, dilapidation, or partial destruction with such repair requiring the services of a qualified mechanic.

**3.** As defined in HCC 21.32.215, a public garage is "a building other than a private garage used

for the care, repair or equipment of automobiles, or where such vehicles are parked or stored for remuneration, hire or sale."

**4.** The first two appeals to the superior court were before Judge Jonathan H. Link. On this third appeal, Griswold filed a peremptory challenge of Judge Link and the case was reassigned to Judge Harold M. Brown.

**5.** *South Anchorage Concerned Coalition, Inc. v. Coffey*, 862 P.2d 168, 173 (Alaska 1993).

**6.** *Id.; Galt v. Stanton*, 591 P.2d 960, 962–63 (Alaska 1979).

**7.** *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

zoning ordinances "should be given great weight and should be accepted whenever there is a reasonable basis for the meaning given by the board." [8] This deferential standard reflects the fact that the Commission and the Board have expertise in administering zoning ordinances and they receive deference equal to that accorded to an administrative agency.[9] With respect to questions of law that do not involve Commission or Board expertise, we substitute our independent judgment.[10] Because the superior court was acting as an intermediate appellate court, we independently review the record.[11]

## IV. DISCUSSION

### A. The Commission's Findings Are Supported by Substantial Evidence.

 This appeal concerns the Commission's approval of COB's nonconforming use. It is the responsibility of the landowner to "show proof of continuing nonconforming use of any property or structure which is in nonconformity." [12] The Commission serves as fact finder, and we determine whether the Commission's factual findings are based upon substantial evidence.[13]

The ordinance in effect at the time COB filed its petition, HCC 21.64.030, provided that "[o]nce the [nonconforming] use is changed or discontinued, or the structure not used for the specific use for more than one year, it shall not be repermitted." [14] While the Commission found that the ordinance required proof of intent to discontinue as well as actual discontinuance, the superior court disagreed and found that intent was irrelevant to the one year non-use provision. The superior court concluded that "the only reasonable interpretation of the one year provision is that a nonconforming use terminates

as soon as the property is not actually used for the nonconforming use for one continuous year." Thus, on remand, COB was required to show, by a preponderance of the evidence, that "no period of greater than one year elapsed during which no vehicle maintenance or repair took place on the property."

The Commission voted against permitting continuation of the nonconforming use as a public garage, but voted four to one that COB had maintained its grandfather rights for vehicle maintenance and repair. The Commission indicated that although the evidence satisfied the preponderance of the evidence standard, it probably would not satisfy a higher standard. The Board, which must accept the Commission's findings of fact if they are supported by "substantial evidence," [15] concluded that the findings were adequately supported by the record.

Griswold claims that although COB provided "a large *quantity* of evidence, [it] was unable to provide *substantial* evidence as provided in HCC 21.68.070(c)(4)." Griswold alleges that the receipts and affidavits that showed work was performed at COB's lot were "fabricat[ed]" and "lacking in fundamental details." Griswold further asserts that even if all the evidence is accepted as valid, "there are one-year gaps."

COB maintains that it has documented forty-six instances of vehicle repair and/or maintenance on the property since 1991. Even while the property was being leased to Maggie's Taxi, COB occasionally performed repair work on the premises solely to maintain its grandfather rights. In addition, COB president Stewart testified before the Commission that although he was told he only had to work on the property once a year to maintain his grandfather rights, he worked

**8.** *South Anchorage Concerned Coalition,* 862 P.2d at 173 n. 12 (quoting 3 Edward Ziegler, RATH-KOPH'S THE LAW OF ZONING AND PLANNING § 42.07 (1992)).

**9.** *Lazy Mountain Land Club v. Matanuska–Susitna Borough Bd. of Adjustment & Appeals,* 904 P.2d 373, 385 n. 68 (Alaska 1995).

**10.** *Alaska Public Employees Ass'n v. State,* 831 P.2d 1245, 1247 (Alaska 1992).

**11.** *South Anchorage Concerned Coalition,* 862 P.2d at 173.

**12.** HCC 21.64.035.

**13.** *South Anchorage Concerned Coalition,* 862 P.2d at 173.

**14.** HCC 21.64.030 (1996) (language has since undergone minor alteration).

**15.** HCC 21.68.074(e).

on the property more than once a year. Stewart conceded that COB did not run an ongoing, day-to-day business on the property. It performed services on the property for cash, checks, and "trade out," meaning Stewart sometimes traded vehicle services for supplies or other work.

■ Substantial evidence is defined as what "a reasonable mind might accept as adequate to support a conclusion." [16] Assuming that COB's occasional use of the property solely to maintain its grandfather rights provides a legal basis to allow a finding of continued nonconforming use, there is substantial evidence to support the trial court's findings.[17] There are several specific vehicle maintenance and repair entries every twelve months. The existence of these activities was established by evidence of over fifty instances of vehicle maintenance and repair. Because it was not unreasonable for the Commission to accept this as evidence of continuing nonconforming use, we conclude that the Commission's findings are supported by substantial evidence.

### B. The Work Was of a Commercial Nature.

■ Griswold also argues that COB did not perform *commercial* automotive service and repair; rather, it bartered services for friends and associates. Griswold contends that this is insufficient to maintain grandfather rights. Although there is no "commercial" requirement in the applicable provision,[18] COB concedes that "to qualify as a valid nonconforming use, the work in question must have been performed on another's vehicle and in exchange for consideration of some sort." COB adds that this is not an issue because all of the work performed on the property was on third-party vehicles and that COB received cash or "trade out" for all of the work.

Griswold's argument boils down to a contention that for work to be considered commercial, it must be performed on strangers' vehicles for cash. Not only is this a unique interpretation of the term "commercial," but it would be nearly impossible to achieve in a small town like Homer. The record indicates that COB performed work on the vehicles of other persons, and that he received some form of consideration for the work. That is sufficient to qualify as "commercial" in this context.

### C. Vehicle Maintenance and Repair Do Not Have To Occur Outdoors.

■ Griswold also claims that the Commission has disallowed the use of the property as a public garage,[19] yet allowed vehicle maintenance and repair to occur inside a

---

16. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

17. The standard applied by the Commission was whether COB had performed work on the property once per year. This standard is apparently consistent with advice to Stewart by the City Planning Department that he only had to perform vehicle maintenance and repair on the property once a year in order to continue the nonconforming use. Griswold has not challenged this standard and it is therefore not before us for review. But whether one use per year is sufficient to maintain a nonconforming use remains an open question. The authorities are split on the issue. 8A Eugene McQuillan, MUNICI-PAL CORPORATIONS § 25.194 (3d ed. 1994) ("Casual, intermittent or temporary use of land may be enough to stop the running of a discontinuance period."); *Estate of Cuomo v. Rush*, 273 A.D.2d 234, 708 N.Y.S.2d 695 (App.2000) (holding that nonconforming use as a nightclub had been lost where the property was used as such only once per year for an annual holiday party attended by twenty to forty people and held for the sole purpose of maintaining the nonconforming use); *but see Islip v. P.B.S. Marina*, 133 A.D.2d 81, 518 N.Y.S.2d 427 (App.1987) (holding that nonconforming use as a marina was not lost where one mooring was leased and used at least once per year); *cf. Cizek v. Concerned Citizens of Eagle River Valley, Inc.*, 41 P.3d 140, 143 (Alaska 2002) (noting that nonconforming uses are disfavored and should be terminated as quickly as possible "because those uses frustrate a local government's implementation of consistent and logical land use planning").

18. In addition, Chapter 21.32 of the Homer City Code, which sets forth the zoning definitions, does not define "commercial."

19. As defined in HCC 21.32.215, a public garage is "a building other than a private garage used for the care, repair or equipment of automobiles, or where such vehicles are parked or stored for remuneration, hire or sale." Compare to HCC 21.32.542 and 21.32.543, set forth in full, *supra* note 2.

building, which effectively allows use of the property as a public garage. There is no merit in this argument and the Board properly addressed it by pointing out that there is no requirement that vehicle maintenance and repair occur outdoors.

### D. The Commission or Board Members Were Not Biased.

Griswold sets forth two claims of bias, one against a member of the Commission and the other against a member of the Board. Griswold argues that the two members had "disqualifying bias[es]." The Homer City Code does not have an ordinance that specifically pertains to bias. Each municipality is directed to adopt a conflict of interest ordinance that provides that a member of a governing body "shall declare a substantial financial interest the member has in an official action and ask to be excused from a vote on the matter." [20] Homer's conflict of interest ordinance, HCC 21.68.090, provides that a member of the Commission or Board may not participate in the deliberation or voting process of an appeal if that person has a substantial financial interest in the official action, or "[o]ther legal grounds for disqualification are established." The ordinance does not define "other legal grounds for disqualification." Homer has also enacted an entire chapter on conflicts of interest as they pertain to other city officers.[21] The conflicts of interest chapter applies only in the event that a city employee or other officer has a "substantial financial interest" in an official action.[22]

■ There have been no allegations that either challenged member has any financial interest in the property at issue here; therefore the only code provision that applies is HCC 21.68.090, which provides for "other legal grounds for disqualification." Since the version of HCC 21.68.090 in effect at the time did not provide a remedy in the event that a conflict of interest is established, we draw

guidance from the three-part test established in *Griswold v. City of Homer* to determine whether the Commission or Board decisions must be invalidated.[23] The threshold issue is whether a member with a disqualifying interest cast the decisive vote. If so, the ordinance is invalid. If not, the court examines three factors: "(1) whether the member disclosed the interest or the other council members were fully aware of it; (2) the extent of the member's participation in the decision; and (3) the magnitude of the member's interest." [24]

#### 1. Chairperson Evans

■ Griswold asserts that Commission Chairperson Evans's question as to whether it would be appropriate for the Commission to reach a decision different from its original decision constitutes bias. He further asserts that Chairperson Evans's "eager[ ]" acceptance of COB's testimony and "unwarranted warnings to Mr. Griswold" also constitute bias. Griswold therefore argues that Evans's participation in the process has "tainted the proceedings" and that all proceedings in which he was involved are therefore invalid.

The Commission first approved COB's nonconforming uses in January 1997. Griswold appealed to the Board, which reversed the Commission, and COB then appealed to the superior court, which in October 1998 reversed the Board and remanded to the Commission to determine whether vehicle maintenance and repair as defined in the Homer City Code took place on the property. On remand in January 1999, Evans—who was not chairperson when the first approval was granted in 1997—asked the Commission's attorney, Allen Tesche, whether the Commission could reverse its prior decision. In response, Tesche explained that the Commission was the trier of fact and, based on the current evidence, could issue a decision different from its original one.

---

**20.** AS 29.20.010(a).

**21.** *See* HCC 1.12.020 (council members); HCC 1.12.060 (city employees and officials); HCC 1.12.070 (members of city boards or commissions).

**22.** HCC 1.12.

**23.** 925 P.2d 1015, 1029 (Alaska 1996).

**24.** *Id.*

The above exchange does not constitute a conflict under the Homer City Code. It is also difficult to see how Evans's brief exchange with Tesche could constitute legal grounds for disqualification. Evans, a non-lawyer and recent appointee as chairperson, expressed a legitimate concern regarding whether the Commission was bound by its earlier decision. In addition, this exchange[25] allegedly took place in January 1999 before the second Commission decision that was later reversed. The third Commission decision underlying the present case occurred in January 2000, when the Commission was considering additional evidence under a different standard. Indeed, Griswold's argument that Evans is biased against him is undermined by the fact that Evans voted against COB in the second decision, concluding that COB had not demonstrated continuing nonconforming use.[26] Griswold's other claims regarding Evans's "eager" acceptance of COB's testimony and "unwarranted warnings" have no merit.

## 2. Board Member Fenske

Griswold asserts that Board member Fenske also had a disqualifying bias and that his participation "automatically nullifies the vote of the Board of Adjustment." In January 1999, on the first remand to the Commission,[27] Fenske, who was not a member of the Commission or Board at the time, participated in the audience commentary at the end of the hearing and voiced his agreement with the Commission's decision to approve the nonconforming uses. Later, Fenske was appointed to the Board and served at the Board's March 1999 and April 2000 hearings. Griswold raised the issue of possible bias on both occasions. Fenske explained that his comments reflected approval of the way in which the Commission handled the situation, rather than approval of the result:

> And I—we should explain the comments that were made at the [Commission] hearing. Because they aren't all inclusive. But, it was a very difficult hearing that the [Commission] had dealt with. And my comments were merely with the evidence that they had been presented with. I thought they did a good job of coming to a conclusion. One conclusion or another.... But I don't think, you know, my judgment has been impaired by the fact that I was showing support for a task, a hard task, that was pursued by a commission.

When specifically asked by Mayor Cushing, who served on the Board at the time, whether he could base his decision on the evidence in front of him, Fenske apparently said "yes," but then added that he understood why Griswold would feel uncomfortable with his presence on the Board.[28]

■ Assuming Griswold's quotations of Fenske's comments are accurate, they do not rise to the level of a "disqualifying bias." Fenske's statement to the Commission that he agreed with its decision was made in January 1999. At that time, the Commission was proceeding under a different legal standard on a different evidentiary record. Eight months after Fenske's comment, in September 1999, the superior court remanded the case for a second time and clarified that the Commission had "used the wrong standard to determine whether COB's various non-conforming uses had been discontinued." The Board did not make the decision now on review until June 2000. In addition, again assuming the veracity of Griswold's quotation, Fenske's March 1999 explanation of his earlier comments suggests that his remark indicated approval of the way the

---

25. For purposes of this argument, we are assuming the exchange actually did take place where and when Griswold claims because, while the two transcript pages containing the exchange are in the record, they are undated, out of context, and there is no title or other identifying information to show that they actually occurred at the January 1999 Commission meeting.

26. Evans did find that COB had *intended* to continue the nonconforming uses, and therefore approved them.

27. The January 1999 remand was the first of two remands, and was designated by a different case number.

28. There is no record support for these comments by Fenske. Griswold's citations in his brief are to an earlier brief containing these statements allegedly by Fenske. We have no way of verifying the statements attributed to Fenske while on the Board, nor can we discern their proper context.

Commission handled the delicate situation, rather than an approval of the result. This explanation is not unreasonable.

■ Even if Fenske's comment did amount to bias, it would not necessarily invalidate the Board's decision. Fenske did not have a financial or personal interest in the case; moreover, Fenske did not cast the deciding vote. There were six Board members and the decision was unanimous. Applying the factors of *Griswold v. City of Homer*,[29] (1) the Board members were fully aware of Fenske's possible bias because it was raised by Griswold and the Board solicited Fenske's explanation twice; (2) the extent of Fenske's participation cannot be determined because the decision was reached in executive session; and (3) Fenske does not have a financial or other interest in the outcome of the case. These factors weigh in favor of not invalidating the Board's decision.

■ In a related argument, Griswold also claims that Mayor Cushing did not have the authority to rule as to whether Fenske had a disqualifying bias. After Griswold raised the issue of Fenske's purported bias for a second time in April 2000, Mayor Cushing stated his opinion that Fenske was not biased and then gave the Board the opportunity to override him:

> MAYOR CUSHING: ... [i]f the Board sees fit to override or—or make the motion to override and have a vote at this ....
>
> ....
>
> COUNCIL MEMBER WELLS: ... I guess I myself feel that—that [Fenske's] impartial in this, and would a motion be necessary to reaffirm that?
>
> MR. TANS: It—it would not be necessary to reaffirm it, in light of the Mayor's already ruling that he should participate, and if the Board does not move to override that, it signifies your at least passive approval.
>
> COUNCIL MEMBER WELLS: So I think he stays.

> MAYOR CUSHING: Okay. Any—in other words, the—anybody on the Board right now has the opportunity to take it to a vote if you like. If not—okay, we'll proceed.

Thus, the Board agreed with the Mayor on the issue of Fenske's participation and did not vote to override the Mayor's decision that Fenske was unbiased.

The conflict of interest provision, HCC 21.68.090, appears not to have contained a clause to address who determines disqualification, and the current version simply states that "the Commission or Board determines" whether a conflicted member should participate. Homer's chapter on conflicts of interest, which was in effect when these proceedings were initiated, provided that voting members of city boards or commissions must disclose financial interests, and "may not participate in the debate or vote upon the matter unless the board or commission determine that a financial interest is not substantial."[30] We conclude that the Board proceeded with proper caution by discussing the matter on the record; moreover, the Board had the opportunity to override the Mayor's initial determination and elected not to do so. This procedure does not conflict with any applicable provisions.

### E. The Board Did Not Improperly Review the Case with an Incomplete Record.

■ Griswold's fourth claim of error is that the Board improperly decided this case without having a complete record of the Commission's January 12, 2000 proceedings. Griswold contends that by reviewing the record without a transcript of the Commission's proceedings, the Board manipulated the evidentiary record "to achieve a desired result." However, Griswold fails to note that, according to HCC 21.68.070, it was his responsibility to obtain a transcript of the testimony before the Commission:

> A verbatim transcript of the testimony before the Planning Commission will be in-

---

**29.** 925 P.2d 1015, 1029 (Alaska 1996).

**30.** HCC 1.12.070. The two authorities Griswold cites in support of his argument that the Mayor could not decide whether a conflict existed are inapplicable: HCC 21.68.100 only applies to ex parte contacts, and Section G of the Bylaws of the Homer Advisory Planning Commission only applies to the Planning Commission.

cluded only if a party makes a written request to the City Clerk within ten days after the filing of the notice of appeal .... All arrangements for preparation of the transcript are the responsibility of the party desiring the transcript.

It was thus Griswold's responsibility to request and provide the transcript. He acknowledges that the ten-day deadline for providing a transcript was March 3, 2000. He also concedes that he did not meet that deadline, and filed a request for an extension on March 10, 2000. That late request was denied, and Griswold does not challenge that ruling. There is no error here.

### F. Griswold Was Not Improperly Denied the Right To Cross–Examine.

 Griswold also claims that his case was prejudiced by "the inadequate notice of his right to cross examine" COB president Stewart at the January 12, 2000 hearing and by "warnings and restrictions imposed" on his cross-examination by Chairperson Evans. He further asserts that "[t]he agenda should have advised parties of their right to cross examine and of their potential obligation to face cross examination." This argument also has no merit. Griswold was given the opportunity to and, in fact, did cross-examine Stewart. Griswold was evidently aware that he would have this opportunity to cross-examine because he had prepared cross-examination questions.[31] Furthermore, Griswold failed to object at the hearing that he did not have adequate notice of the opportunity to cross-examine or that he was unprepared to do so.

Moreover, Chairperson Evans did not impose restrictions on Griswold's cross-examination of Stewart. Rather, Chairperson Evans cautioned Griswold to be "brief [and] courteous," and reserved the "right to reign [sic] [Griswold] in should [he] get out of tolerable acceptance level." These admonitions did not constitute substantive restrictions on Griswold's cross-examination and did not interfere with his examination of Stewart.

### G. Griswold Was Not Improperly Denied the Opportunity To Speak.

 Griswold's final argument is that neither the parties nor the public were provided the opportunity to speak at the Board's meeting. He bases this claim on AS 29.20.020(a) which provides that municipal bodies "shall provide reasonable opportunity for the public to be heard at regular and special meetings." That statute also provides that "[m]eetings of all municipal bodies shall be public as provided in AS 44.62.310." Alaska Statute 44.62.310, the Open Meetings Act, specifically provides an exemption for governmental bodies "performing a judicial or quasi-judicial function when holding a meeting solely to make a decision in an adjudicatory proceeding."[32] Griswold concedes that, because of this provision, the Board is exempt from the Open Meetings Act. However, he seems to argue that the provision allowing "reasonable opportunity for the public to be heard" exists in a vacuum and is unaffected by the Board's exemption from the Open Meetings Act. Thus, Griswold is claiming that while the Board may conduct its appellate review in private, the public must be afforded the opportunity to speak at closed proceedings. Such a result is incongruous and would eviscerate the Board's exemption from the Open Meetings Act. Nevertheless, even if he were entitled to be heard, he made no oral or written request to speak. Furthermore, he filed two appellate briefs with the Board. Griswold had "reasonable opportunity" to set forth his arguments, and he did so.

## V. CONCLUSION

For the foregoing reasons, the decision of the superior court is AFFIRMED.

---

**31.** Griswold asked "I was wondering if I was going to be given the opportunity to cross examine that witness before I give my presentation." Griswold then asked Stewart a series of questions about licensing, sales, tax, and Stewart's prior testimony.

**32.** AS 44.62.310(d)(1).